**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kendall Drake, et al.,<br><br>                    Plaintiffs,<br><br>v.<br><br>City of Eloy, et al.,<br><br>                    Defendants. | No. CV-14-00670-PHX-DGC<br><br>**ORDER** |

Defendants filed separate motions for summary judgment against Plaintiffs Kendall Drake and Greg Hunter.  Docs. 88, 90.  The motions are fully briefed, and no party has requested oral argument.  The Court will grant the motions in part and deny them in part.

**I.    Background.**

Plaintiffs Kendall Drake and Greg Hunter were police officers with the City of Eloy Police Department.  Both ultimately resigned from their positions.  Plaintiffs sued Defendants City of Eloy, Michelle Tarango, David Crane, William Pitman, and Brian Jerome, alleging a number of claims arising from their tenure with the Department. William Pitman was the chief of police; Michelle Tarango was the lieutenant in charge of patrol and had supervisory duties over Crane, Drake, and Hunter; David Crane was the sergeant with immediate supervisory authority over Drake and Hunter; Brian Jerome was a sergeant whose duties included internal investigations of misconduct.

Drake was hired on August 22, 2011, as a communications and detention specialist. Doc. 89-2 at 3. On October 2, 2011, Drake entered the police academy. *Id.* She became a probationary patrol officer on January 28, 2012. *Id.* Hunter was hired by the City of Eloy on May 22, 2012, as a probationary patrol officer. *Id.* Tarango eventually assigned Drake and Hunter to work together under Crane (Doc. 104-1 at 12), who was promoted to sergeant in September 2012 (Doc. 89-5 at 56).

On April 20, 2013, Drake and Hunter were dispatched to the scene of a dying cat. Drake, who had previously worked as an animal control officer, knew "after a few seconds of looking at" the cat that it needed to be euthanized. Doc. 104-1 at 53-55. Drake requested assistance from an animal control officer. *Id.* at 54. When she learned that animal control was unavailable, Drake sought approval from Crane over the radio to euthanize the injured cat. *Id.* at 58. Crane subsequently arrived at the scene. Doc. 89-3 at 59. Drake, Hunter, and Crane discussed the situation. Doc. 89-3 at 59. At some point, Drake told Crane that "intentionally and knowingly allowing an animal to suffer is a felony." *Id.* at 60. Crane eventually put the injured cat in his truck and left. *Id.* He did not inform Drake and Hunter of where or how he intended to euthanize the cat. *Id.* Crane "drove directly to the landfill and euthanized the cat with [his] service weapon." Doc. 89-5 at 56.

Drake was upset that Crane had left the scene without informing her of what he intended to do with the cat. Doc. 89-3 at 60. Drake went to dispatch to find out what Crane had done with the animal. *Id.* In dispatch, Drake spoke with Dana Jackson. *Id.* Drake mentioned animal cruelty during the conversation, but she did not directly accuse Crane of committing a crime. *Id.* at 60-61. While Drake and Jackson were conversing, Jerome arrived. Doc. 89-9 at 6. According to Jerome, Drake appeared upset. *Id.* Drake relayed her account of the cat incident to Jerome. *Id.*

Crane subsequently requested that Drake and Hunter each prepare memoranda detailing the events of April 20, 2013. Doc. 89-8 at 16, 28-29. Both officers submitted their memoranda to Crane on May 6, 2013. Docs. 104-5 at 12; 104-7 at 42. Drake wrote

that she was providing the memorandum in accordance with Crane's request for a "memo describing what [Crane] referred to as the 'incident in dispatch.'"  Doc. 104-5 at 12. Drake described the cat incident in detail, referring to the wounded animal's suffering numerous times.  *See id.* at 12-16.  Drake stated that she "advised [Crane] that knowingly allowing an animal to suffer and failing to take actions to ease or cease the suffering may be considered a felony offense per chapter 2910 of title 13 and we needed to GO."  *Id.* at 14.  Drake also recounted subsequent conversations with Jerome in which Jerome expressed concerns about her fitness for duty.  *Id.* at 14-15.  Hunter's memorandum, although less detailed, was consistent with Drake's.  *See* Doc. 104-7 at 42-43.

The memoranda – particularly Drake's – created tension between Crane and Drake.  After reviewing Drake's memorandum, Crane told her it was "off scope." Doc. 104-5 at 20.  Crane had anticipated that Drake's memorandum would be limited to what occurred in dispatch.  *Id.*  Crane also asked Drake to "keep everything in-house" and not "put dirty laundry out there for other shifts or other Sergeants or Dispatch or whomever."  *Id.* at 26, 34.  In a memorandum to Lieutenant Tarango, Crane subsequently questioned whether Drake was able to perform her job duties effectively.  Doc. 104-4 at 61.  As a result of these issues, Drake asked to be removed from Crane's supervision. Doc. 89-5 at 63.  Tarango granted this request, but without providing advance notice to Drake.  Doc. 89-4 at 4.  The schedule change forced Drake to use leave time to move, and also required her to miss training programs she otherwise would have attended. Doc. 104-1 at 38-39.

Tarango directed Crane to prepare a performance evaluation of Drake, which he produced on May 12, 2013.  Doc. 89-4 at 3.  This evaluation never appeared in Drake's personnel file.  Doc. 89-2 at 3.  Drake subsequently complained to Tarango about the evaluation.  Doc. 89-4 at 3.  Tarango revised the evaluation, adding statistical information to support her subjective ratings.  *Id.*  Drake received an overall "satisfactory" rating on her May 20, 2013 performance evaluation, which qualified her for a retroactive merit pay increase.  *Id.*

1          On May 22, 2013, Drake submitted an "offensive behavior/harassment complaint"

2    to the City of Eloy human resources department.  Doc. 104-5 at 65-70.  The complaint

3    stated that Drake felt "extremely uncomfortable at work all the time now" and felt like

4    she was "being singled out."  *Id.* at 70.  She requested that the City of Eloy refer the

5    matter for investigation by an independent law enforcement agency.  *Id.*  As a result, the

6    Pinal County Sheriff's Office conducted an investigation.  *See* Doc. 104-6 at 2-12, 14-22.

7    Drake also filed complaints with the Arizona Attorney General's Office and the Arizona

8    Personnel Board.  *Id.* at 24, 26-32.

9          In June 2013, Drake accused a fellow officer, Jeffrey Young, of sexual

10   harassment.  In a series of text messages, Young expressed romantic feelings for Drake

11   and asked her to send him nude photographs of herself.  Doc. 89-4 at 86-88.  Young was

12   immediately placed on paid administrative leave pending investigation.  *Id.* at 44.  After

13   the investigation, Young was suspended without pay for 40 hours and removed from the

14   list of promotion-eligible officers.  *Id.* at 45.  The Eloy City Manager directed Chief

15   Pitman to minimize the contact between Young and Drake.  *Id.*  Pitman, in turn, directed

16   Lieutenant Tarango to minimize the amount of overlap between their schedules.  *Id.*

17         Some contact between Drake and Young was inevitable.  On several occasions,

18   Young purposely worked in close proximity to Drake in the squad room, despite the City

19   Manager's and Pitman's directives.  Doc. 104-1 at 48.  Neither Drake's nor Young's

20   superior officers intervened.  *Id.*  Drake identified one interaction with Young as

21   particularly egregious.  Drake was working on the computers in the squad room when

22   Young entered.  Doc. 89-3 at 42-43.  Young sat close to Drake and "leered" at her breasts

23   with a "creepy smirk on his face."  *Id.* at 43.  Drake resigned shortly thereafter, on

24   September 24, 2013.  Doc. 89-2 at 3.

25         After her resignation, and within earshot of Hunter, Chief Pitman said that Drake's

26   departure was "[o]ne bad hire down, one to go."  *Id.* at 62.  On July 14, 2013, Hunter

27   received a performance evaluation from Crane that "came as a complete surprise."

28   Doc. 94 at 18.   Hunter's overall performance was rated as "needs improvement."

Doc. 104-7 at 50.   Five days later, Hunter filed an "offensive behavior/harassment" complaint with the City human resources department.   *See* Doc. 94 at 16-23.   The complaint disputed the factual content of Hunter's evaluation in great detail.   *See id.* Hunter ultimately accused Crane of fraud, and sought a referral for an independent investigation. *Id.* at 17.

Hunter was involved in two other incidents.   First, the Department investigated whether Hunter had abused his use of leave time on June 17, 2013 by feigning illness shortly after his request for leave was denied.   Docs. 89-4 at 45-46; 89-5 at 5-7.   Second, Crane informed Tarango and Pitman that Hunter was unable to wear a ballistic vest because of a medical condition.   Doc. 89-4 at 6.   After Hunter met with a dermatology specialist, Pitman directed Tarango to research alternative ballistic vests or vest cooling devices that would allow the Department to satisfy its mandatory-vest policy.   *Id.*   While this research was on-going, Pitman assigned Hunter to work in dispatch.   *Id.* at 46.   After receiving reports that Hunter was disruptive in dispatch, Pitman assigned him to work in the squad room on administrative tasks.   *Id.* at 46-47.   After reports that Hunter was again being disruptive, Pitman moved him to the interview room.   *Id.* at 47.   Hunter resigned on October 30, 2013, while the search for a suitable ballistic vest was still on-going. Doc. 89-2 at 3.

## II.   Summary Judgment Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).   Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.   Analysis.

Defendants seek summary judgment on Plaintiffs' claims for: (1) defamation; (2) false light invasion of privacy; (3) violation of their free speech rights under the Arizona Constitution; (4) retaliation for speech protected by the First Amendment; (5) deprivation of their protected liberty interests under the Fourteenth Amendment; (6) violation of Arizona's whistleblower statutes; and (7) constructive discharge. Defendants also filed a Rule 56(c)(2) objection to Plaintiffs' reliance on an investigation report.

Plaintiffs make no effort to respond to the motions on their claims for defamation, false light invasion of privacy, denial of free speech under the Arizona Constitution, and denial of due process under the Fourteenth Amendment.  They do not even mention these claims in their responses.  This is not appropriate.  If Plaintiffs cannot support some of their claims, they should say so.  More importantly, Plaintiffs should voluntarily dismiss the claims before summary judgment and save Defendants and the Court the effort of briefing and reviewing them.  The Court will grant summary judgment on the claims for defamation, false light invasion of privacy, denial of free speech under the Arizona Constitution, and denial of due process under the Fourteenth Amendment.

### A.   Evidentiary Objections.

In ruling on a motion for summary judgment, the Court may consider only evidence that would be admissible at trial.  *See* Fed. R. Civ. P. 56(c)(2); *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).  Defendants challenge the admissibility of evidence proffered by Plaintiffs in opposition to Defendants' motions for summary judgment. Doc. 111.  Defendants specifically challenge Plaintiffs' Exhibit 4, which is an investigation report prepared by Victoria Torrilhon, a lawyer retained by Defendants to

1    investigate the incidents leading up to the resignations of Drake and Hunter.

2         Plaintiffs' Exhibit 4 is hearsay.  It is a writing offered to prove the truth of the

3    matters asserted.  Fed. R. Evid. 801(c).  Hearsay evidence is generally inadmissible

4    "unless it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within

5    a hearsay exception under Rules 803, 804 or 807."  *Orr*, 285 F.3d at 778.  Plaintiffs have

6    not argued that this report or the statements it contains are excepted or excluded as non-

7    hearsay under any of the Federal Rules of Evidence.  As a result, the Court will not

8    consider Exhibit 4 for purposes of resolving the motions for summary judgment.

9         **B.    First Amendment Retaliation Claims.**

10        To establish a First Amendment retaliation claim in the Ninth Circuit, Plaintiffs

11   must establish that: (1) Plaintiffs' speech addressed an issue of public concern,

12   (2) Plaintiffs spoke as private citizens, (3) Defendants took an adverse employment

13   action and Plaintiffs' speech was a substantial or motivating factor in that action,

14   (4) Defendants lacked an adequate justification for treating Plaintiffs differently than

15   members of the general public, and (5) Defendants would not have reached the same

16   adverse employment decision even in the absence of the protected conduct.  *Eng v.*

17   *Cooley*, 552 F.3d 1062, 1070-72 (9th Cir. 2009).  Failure to satisfy any of these elements

18   is fatal to a plaintiff's claim.  *Hagen v. City of Eugene*, 736 F.3d 1251, 1257 (9th Cir.

19   2013).

20        Defendants argue that Plaintiffs did not engage in speech on a matter of public

21   concern.  Drake identifies two instances in response: (1) her May 6, 2013 memorandum

22   to Crane, in which Drake recounts the events that occurred in April 2013 (Doc. 104-5 at

23   12-16), and (2) her May 22, 2013 offensive behavior/harassment complaint, in which

24   Drake describes events that occurred in April and May 2013 (*id.* at 65-70).  Hunter also

25   identifies two instances in response: (1) his May 6, 2013 memorandum to Crane, in

26   which Hunter recounts the events that occurred in April 2013 (Doc. 104-7 at 42-43), and

27   (2) his July 19, 2013 offensive behavior/harassment complaint, in which he disputes the

28   factual contents of his July 14, 2013 performance evaluation (Doc. 94 at 16-23).  The

Court will consider the May 6 memoranda together, and then the offensive behavior/ harassment complaints.

### 1.   The May 6, 2013 Memoranda to Crane.

Defendants argue that the memoranda cannot support a First Amendment retaliation claim because they do not involve a matter of public concern and because both Drake and Hunter were acting as public employees, not private citizens. The Court agrees with the second argument.

In *Dahlia v. Rodriguez*, 735 F.3d 1060 (9th Cir. 2013) (en banc) ("*Dahlia II*"), the Ninth Circuit laid out three "guiding principles" to determine whether a public employee's speech falls within the scope of his job duties. *Id.* at 1074. "First, particularly in a highly hierarchical employment setting such as law enforcement, whether or not the employee confined his communications to his chain of command is a relevant, if not necessarily dispositive, factor in determining whether he spoke pursuant to his official duties." *Id.* When an employee communicates with those outside of his chain of command, it is more likely that he is acting as a private citizen rather than as a public employee. *Id.* (citing *Freitag v. Ayers*, 468 F.3d 528, 545-46 (9th Cir. 2006)). Second, the subject matter is highly relevant. *Id.* at 1074-75. For instance, a routine report would typically fall within a public employee's job duties, while a report transmitting "broad concerns about corruption or systemic abuse" would not. *Id.* at 1075. Finally, if speech is in direct contravention of a supervisor's orders, it is likely private speech. *Id.*

Each of the three guiding principles weighs in favor of finding that Plaintiffs acted as public employees in authoring their May 6, 2013 memoranda. First, the memoranda were written to Plaintiffs' immediate supervisor, Crane. Docs. 104-5 at 12; 104-7 at 42. Second, the memoranda concerned events that occurred within the scope of Plaintiffs' duties and addressed a possible criminal act – animal cruelty. Docs. 89-3 at 61; 104-5 at 12-16, 20. The memoranda are closer to an officer's routine report than a statement of "broad concerns about corruption or systemic abuse." *Dahlia II*, 735 F.3d at 1075.

Finally, the memoranda were not written in direct contravention of a supervisor's orders; they were written at Crane's request.  *Id.*  The Court therefore finds that Plaintiffs acted as public employees in writing the memoranda and will grant summary judgment on Plaintiffs' First Amendment retaliation claims based on the memoranda.  *Hagen*, 736 F.3d at 1257.

### 2.       The Offensive Behavior/Harassment Complaints.

Defendants argue that Plaintiffs' offensive behavior/harassment complaints to the City of Eloy cannot support a First Amendment retaliation claim because the speech does not involve a matter of public concern and Plaintiffs spoke as public employees. Plaintiffs have presented sufficient evidence for a reasonable jury to find to the contrary.

### a.       Matter of Public Concern.

In *Desrochers v. City of San Bernadino*, 572 F.3d 703 (9th Cir. 2009), the Ninth Circuit explained that Plaintiffs bear the burden of showing that their speech addressed an issue of public concern based on "'the content, form, and context of a given statement, as revealed by the whole record.'"  *Id.* at 709 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).  Speech addresses a matter of public concern when its content involves information that is necessary "to enable the members of society to make informed decisions about the operation of their government."  *Id.* at 710 (quotation and citations omitted).  Under this standard, internal personnel disputes do not involve matters of public concern, while "allegations of conduct amounting to 'actual or potential wrongdoing or breach of public trust'" do.  *Id.* at 710-11 (quoting *Connick*, 461 U.S. at 148); *see also Freitag*, 468 F.3d at 545-46 (holding that allegations that inmates sexually abused female correctional officers addressed a matter of public concern).

Plaintiffs' complaints referred to several matters of public concern.  First, Drake's complaint and its attachment – her May 6, 2013 memorandum – repeatedly allege that Crane may have committed animal cruelty, a crime in Arizona under A.R.S. § 13-2910. Doc. 104-5 at 12-16, 65-70.  At one point, Drake even references the specific animal cruelty statute.  *Id.* at 14 ("I advised [Crane] that knowingly allowing an animal to suffer

and failing to take actions to ease or cease the suffering may be considered a felony per chapter 2910 of title 13 and we needed to GO.").   Second, Drake generally alleges "malfeasance and misconduct" by Crane and Jerome.  *Id.* at 67.  Finally, both Drake and Hunter generally allege that Crane committed fraud or forgery.  Hunter alleges that Crane authored a "fraudulent" performance evaluation and that Crane was under investigation for writing two fraudulent performance evaluations for Drake.  Doc. 94 at 17-19.   As Plaintiffs' complaints contained allegations of animal cruelty, forgery, and fraud, which are all criminal acts, the content of the complaints weighs in favor of finding that they addressed matters of public concern.  *Desrochers*, 572 F.3d at 710-11; *Freitag*, 468 F.3d at 545-46.

The form of Plaintiffs' speech also weighs in favor of finding that it addressed matters of public concern.  The fact that an employee "'expressed his views inside his office, rather than publicly, is not dispositive.'"  *Desrochers*, 572 F.3d at 714 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 420 (2006)).  At the same time, a broader distribution is consistent with a finding of public concern, while "a limited audience weighs against a claim of protected speech."  *Id.* (quotation and citation omitted).   Here, Plaintiffs distributed their speech to an outside organization, the City of Eloy.  Docs. 94 at 16-23; 104-5 at 65-70.  And as a result of Drake's complaint, the Pinal County Sheriff's Office investigated whether Crane authored fraudulent performance evaluations (Doc. 104-6 at 2-12), and committed animal cruelty (*id.* at 14-22).   Drake also filed other complaints with outside organizations, including the Arizona Attorney General's Office (*id.* at 24) and the Arizona Personnel Board (*id.* at 26-32).  Further, at least one prominent national animal rights organization became aware of Drake's animal cruelty allegations and submitted a public records request to the Eloy Police Department.  *Id.* at 34.  Because Plaintiffs took steps to disseminate their speech to outside organizations, the form of Plaintiffs' complaints weighs in favor of finding that they addressed matters of public concern.  *Desrochers*, 572 F.3d at 714-15.

The context also supports a finding that Plaintiffs' complaints addressed matters of

public concern.  Context addresses whether the purpose of the speech was to bring to light actual or potential wrongdoing or a breach of public trust, or was merely motivated by dissatisfaction with one's employment situation.  *Id.* at 715 (quotations and citations omitted).  Plaintiffs' complaints alleged actual or potential wrongdoing committed by a law enforcement officer.  *See* Docs. 94 at 16-23; 104-5 at 65-70.  Further, both complaints sought an independent investigation by an outside law enforcement agency.  Docs. 94 at 17; 104-5 at 66.  To be sure, Plaintiffs' complaints were motivated by dissatisfaction with their employment situation.  This is particularly true with respect to Hunter's complaint, which is largely devoted to perceived factual inaccuracies in his performance evaluation.  *See* Doc. 94 at 18-23.  But Plaintiffs' dual motivations do not preclude a finding that their speech addressed matters of public concern.  And even if a jury were to conclude that the context weighed against a finding of public concern, the content and form of the speech could be viewed as weighing strongly in favor of such a finding.  *Desrochers*, 572 F.3d at 709.  The Court concludes that Plaintiffs have presented enough evidence to raise a material question of fact with respect to the first *Eng* factor.

### b.      Public Employees or Private Citizens?

As previously discussed, the Ninth Circuit has provided three guiding principles to assist in determining whether, in the context of law enforcement, a public employee's speech falls within the scope of his job duties.  *Dahlia II*, 735 F.3d at 1074.  These include whether the employee's speech was made within the chain of command, the subject matter of the speech, and whether the speech was made in direct contravention of a supervisor's orders.  *Id.* at 1074-76.

Plaintiffs' complaints were not confined to the chain of command.  They were delivered to the City of Eloy.  Docs. 94 at 16-23; 104-5 at 65-70.  Drake also sent her complaint to other independent agencies.  Doc. 104-6 at 24, 26-32.  Nor were the complaints routine reports under normal departmental procedures.  *Dahlia II*, 735 F.3d at 1074-75.  The complaints contained allegations of criminal misconduct by a Department officer.  *See* Docs. 94 at 16-23; 104-5 at 65-70.  Finally, the complaints were sent to the

City and others in contravention of Crane's desire to "keep everything in-house" and not "put dirty laundry out there for other shifts or other Sergeants or Dispatch or whomever." Doc. 104-5 at 34.  Plaintiffs have presented sufficient evidence for a reasonable jury to find that Plaintiffs acted as private citizens when they filed their complaints with the City of Eloy.  *Dahlia II*, 735 F.3d at 1074-75; *see also Freitag*, 468 F.3d at 545-46.

Defendants do not contend that Plaintiffs are unable to satisfy the other elements of First Amendment retaliation.  *Eng*, 552 F.3d at 1070-72.  The Court will deny the motions for summary judgment on this claim.

### 3.   Qualified Immunity.

The individual Defendants – Crane, Jerome, Pitman, and Tarango – argue that they are entitled to qualified immunity on Plaintiffs' First Amendment retaliation claim. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation and citation omitted).  "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right."  *Id.* at 232.

Defendants make only one qualified immunity argument – that the law was not clearly established at the time of their alleged misconduct.  Relying on *Huppert v. City of Pittsburg*, 574 F.3d 696 (9th Cir. 2009), *overruled in Dahlia II*, 735 F.3d at 1071, Defendants argue that Plaintiffs had a duty as law enforcement officers to report their fellow officer's misconduct, which rendered their speech unprotected by the First Amendment.  Docs. 88 at 14-15; 90 at 12-13.  Because the speech was not protected, Defendants argue, they could not have known that their alleged conduct violated a clearly established constitutional right.

The Court is not persuaded.  *Huppert*, even before it was overruled by *Dahlia II*, was based entirely on the duties of law enforcement officers under California law.  574 F.3d at 707-08.  The other case cited by Defendants, *Dahlia v. Rodriguez* ("*Dahlia I*"),

689 F.3d 1094, 1104 (9th Cir. 2012), also concerned a California law enforcement officer.  These cases do not purport to establish the same rule for Arizona officers, and Defendants have identified no similar legal duty under Arizona law.

In the last sentence of a long footnote in their motion, Defendants cite an Eloy Police Department General Order requiring employees to report their colleagues' misconduct, suggesting that this order required Plaintiffs' complaints and therefore deprived them of First Amendment protection. Docs. 88 at 15 n.16; 89-5 at 28; 90 at 12 n.9.  The Court cannot conclude, however, that this is enough to establish that Plaintiffs' complaints were unprotected.  As the Supreme Court has made clear, the inquiry about whether a plaintiff's speech was required by his or her job duties is a practical one that must look to the specifics of the plaintiff's employment.  *Garcetti*, 547 U.S. at 424-25 ("The proper inquiry is a practical one.  Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes."); *see also Dahlia II*, 735 F.3d at 1069. Defendants' footnote does not discuss the practical requirements of Plaintiffs' job.

Moreover, *Garcetti*, *Dahlia II*, and even *Huppert* concerned speech required as part of a plaintiff's official position.  Plaintiffs' offensive behavior/harassment complaints constituted speech outside their official duties.[1]

Defendants have not shown as a matter of undisputed fact that Plaintiffs' speech lacked the protection of the First Amendment.  The Court therefore cannot grant summary judgment on the basis of qualified immunity.

### 4.     Municipal Liability.

Defendant City of Eloy argues that Plaintiffs have failed to establish municipal liability.  Under *Monell v. Department of Social Services of New York*, 436 U.S. 658

---

[1] Defendants' reply cites facts suggesting that the May 6 memoranda were written at Crane's request, but says nothing about the offensive behavior/harassment complaints.

(1978), municipalities are liable under 42 U.S.C. § 1983 – the claim asserted by Plaintiffs in this case – "when the plaintiff was injured pursuant to an expressly adopted official policy, a long-standing practice or custom, or the decision of a 'final policymaker.'" *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1066 (9th Cir. 2013) (quotation and citation omitted). To prevail on the theory of a long-standing practice or custom, a plaintiff must "prove 'the existence of a widespread practice that . . . is so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Gillette v. Delmore*, 979 F.2d 1342, 1348-49 (9th Cir. 1992) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "For purposes of liability under *Monell*, a 'policy' is a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Fogel v. Collins*, 531 F.3d 824, 834 (9th Cir. 2008) (quotation and citation omitted). Whether a state official is a final policymaker for purposes of municipal liability is a question of state law. *Streit v. Cnty. of L.A.*, 236 F.3d 552, 560 (9th Cir. 2001). When assessing final policymaking authority, courts ask whether the individual has authority "in a particular area, or on a particular issue." *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 (1997) (citation omitted).

Plaintiffs first argue that municipal liability should be imposed on the City because their injury resulted from "a longstanding practice of retaliation against officers who dare challenge or levy accusations against Department leadership." Docs. 99 at 30; 112 at 29. To support this claim, Plaintiffs cite deposition testimony from Officer Jim Salazar that Plaintiffs were referred to as troublemakers and Salazar was told he should avoid associating with them (Doc. 104-6 at 47), and from Darrell Roach that Department leadership "come after you if you go against them" (Doc. 104-2 at 127-28). Doc. 99 at 30 n.121. Roach also testified that two other officers experienced retaliation during the 19 years he spent with the Department. Doc. 104-2 at 126-145.

To defeat summary judgment, however, Plaintiffs must present sufficient evidence for a reasonable jury to return a verdict in their favor. *Anderson*, 477 U.S. at 248. The

deposition testimony cited by Plaintiffs, even if believed, does not show "'a widespread practice that . . . is so permanent and well settled as to constitute a "custom or usage" with the force of law.'"  *Gillette*, 979 F.2d at 1348-49 (quoting *Praprotnik*, 485 U.S. at 127).  Plaintiffs have not presented sufficient evidence to survive summary judgment on the municipal liability issue under *Monell* on the basis of custom or usage.

Alternatively, Plaintiffs seek to impose *Monell* liability on the City based on a final policymaker's decision.  Plaintiffs contend that Defendants admit that Chief Pitman was a policymaker (Docs. 99 at 30; 112 at 29), but this is not an accurate characterization of Defendants' position.  Defendants state that "[a]t most, depending on the action an employee might complain about, a police chief might be viewed as a policymaker." Docs. 88 at 16; 90 at 14.  Defendants' statement does not amount to an admission that Pitman is a final policymaker for all purposes, including the actions in this case.

Plaintiff Drake's response to the motion for summary judgment asserts, without citation to the factual record, that Pitman "had final policy-making authority, personally participated in the retaliation or, at a minimum, ratified his co-defendant's actions." Doc. 99 at 30.  Hunter's response makes the same assertion, again without citation to the factual record.  Doc. 112 at 29.  Although Plaintiffs attached a statement of facts with numerous exhibits, it is not the Court's duty to scour this record in search of evidence to support Plaintiffs' assertions.  *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *see also Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (finding that the district court has no responsibility on summary judgment to "scour the record in search of a genuine issue of triable fact").

Moreover, the Eloy Chief of Police has limited enumerated duties, none of which expressly covers personnel decisions.  *See* Eloy Code § 2-17(B).  The City Manager is tasked with the authority to make personnel decisions, including the power to hire, fire, and suspend all officers and employees of the city.  *Id.* § 2-54(A).  These powers can be delegated, but Plaintiffs present no evidence that the City Manager delegated to Pitman the authority to make personnel decisions for officers under his command or that Pitman

1   was in fact the final policymaker in this case.

2       Plaintiffs have failed to present evidence from which a reasonable jury could find

3   that the actions in this case were taken by a final City policymaker.  Because summary

4   judgment may be granted against a party who has failed "to make a showing sufficient to

5   establish the existence of an element essential to that party's case, and on which that

6   party will bear the burden of proof at trial," the Court will grant summary judgment on

7   Plaintiffs' First Amendment claims against the City of Eloy.  *Celotex*, 477 U.S. at 322.

8       **C.    Whistleblower Claims.**

9       Under Arizona's whistleblower statutes, a supervisor may not "take reprisal

10  against an employee for a [written] disclosure of information of a matter of public

11  concern by the employee to a public body that the employee reasonably believes

12  evidences . . . [a] violation of any law."  A.R.S. § 38-532(A), (B).  The disclosure must

13  include the "nature of the alleged violation of law."  A.R.S. § 38-532(B)(3).

14      Plaintiffs' allegations of police officer misconduct involve a matter of public

15  concern within the meaning of A.R.S. § 38-532(A).  The term "matter of public concern"

16  is not defined in the whistleblower statute, but under federal First Amendment retaliation

17  law, which the Court finds analogous, speech addresses a matter of public concern when

18  it involves information necessary for "members of society to make informed decisions

19  about the operation of their government."  *Desrochers*, 572 F.3d at 710 (quotation and

20  citations omitted).  Internal personnel disputes do not qualify, but "allegations of conduct

21  amounting to 'actual or potential wrongdoing or breach of public trust'" do.  *Id.* at 712

22  (quoting *Connick*, 461 U.S. at 148).  Plaintiffs generally allege that Crane committed

23  animal cruelty.  Docs. 99 at 9-10; 112 at 8-9.  Animal cruelty is a criminal act, and in

24  some cases a felony.  *See* A.R.S. § 13-2910(A), (G).  Hunter also alleges that Crane may

25  have committed fraud or forgery.  Doc. 112 at 11-12.  Animal cruelty, fraud, and forgery

26  all constitute actual or potential wrongdoing.  *Desrochers*, 572 F.3d at 710-11.

27      Plaintiffs identify several written disclosures as qualifying for whistleblower

28  protection.  Drake points to: (1) her May 6, 2013 memorandum to Crane (Doc. 104-5 at

12-16), (2) her May 22, 2013 offensive behavior/harassment complaint filed with the City of Eloy human resources department (*id.* at 65-70), (3) her May 2013 complaint filed with the Arizona Attorney General (Doc. 104-6 at 24), and (4) her May 2013 complaint filed with the Arizona Personnel Board (*id.* at 26-32).  Hunter identifies two: (1) his May 6, 2013 memorandum to Crane (Doc. 104-7 at 42-43), and (2) his July 19, 2013 offensive behavior/harassment complaint filed with the City of Eloy human resources department (Doc. 94 at 16-23).  Each of these constitutes a written disclosure within the meaning of Arizona's whistleblower statutes.  *See* A.R.S. § 38-532(A), (B).

Plaintiffs' written disclosures, however, must have been made to a "public body." Arizona's whistleblower statutes define "public body" narrowly to mean only "the attorney general, the legislature, the governor, a federal, state or local law enforcement agency, the county attorney, the governing board of a community college district or school district, the board of supervisors of a county or an agency director."  A.R.S. § 38-531(5).  Written disclosures to entities other than public bodies do not trigger Arizona's whistleblower protections.  *See McCormick v. Ariz. Bd. of Regents*, No. 06-cv-02008-PHX-DGC, 2007 WL 2948981, at *3-4 (D. Ariz. Oct. 10, 2007) (denying whistleblower protection under A.R.S. § 38-532 for an email to internal human resources department because it was not sent to a public body as defined by A.R.S. § 38-531(5)).  Of the written disclosures identified by Plaintiffs, only Drake's complaint to the Arizona Attorney General clearly qualifies as a written disclosure to a public body within the terms of A.R.S. § 38-531(5).

The Arizona Supreme Court has expressed a strong policy of providing protection to the actions of public employees who serve a public purpose by exposing illegal or unsafe practices or "otherwise serve some singularly public purpose."  *Wagner v. City of Globe*, 722 P.2d 250, 257 (Ariz. 1986).  Defendants argue that Plaintiffs' May 6 memoranda do not constitute a disclosure within the meaning of the whistleblower statutes.  Docs. 88 at 18-22; 90 at 16-19.  Plaintiffs respond by pointing to their actions in re-publishing the memoranda outside the chain of command.  Docs. 99 at 10-12; 112 at

9-11. It is undisputed that Crane ordered Plaintiffs to prepare and submit the memoranda. Docs. 104-5 at 12; 104-7 at 42. They were submitted internally, up the chain of command, to Crane, the officer alleged to have committed animal cruelty. *Id.* Submitting these memoranda internally to the alleged wrongdoer cannot be described as exposing illegality. *Wagner*, 722 P.2d at 257. Nor may this behavior be viewed as serving a "singularly public purpose." *Id.* Instead, Plaintiffs authored their May 6 memoranda because they were ordered to do so. The Court therefore finds that the memoranda to Crane do not constitute a public disclosure to a public body within the meaning of A.R.S. § 38-532(A).

Nor do Plaintiffs' complaints to the City of Eloy human resources department qualify as disclosures to a "public body." A municipality is not included within the statutory definition of "public body." A.R.S. § 38-531(5). Plaintiffs argue that the complaints were eventually forwarded for investigation to other agencies, including a local law enforcement agency. Docs. 99 at 12; 112 at 12. But this is insufficient. Whistleblower protection applies only when a disclosure is made "by the employee to a public body." A.R.S. § 38-532(A). Plaintiffs made their disclosures to the City of Eloy, which is not a public body, and the City of Eloy forwarded the complaints to other agencies. Because Plaintiffs did not satisfy the plain terms of the whistleblower statute, their whistleblower claims based on these complaints must fail.

Drake's complaint to the Arizona Personnel Board was likewise not a disclosure to a "public body." The Board occupies a special position in Arizona's whistleblower statutes – it reviews complaints filed under the whistleblower statutes. A.R.S. §§ 38-532(H); 41-782(B). But the Board is not listed among the public bodies to which a public disclosure can be made to trigger whistleblower protection. A.R.S. § 38-531(5).

Defendants do not dispute that the Attorney General is a "public body" for purposes of A.R.S. § 23-531(5). They argue instead that Drake did not experience any adverse personnel actions in reprisal for her Attorney General complaint. Under the whistleblower statutes, reprisal "means to take a personnel action the result of which is

adverse to an employee." A.R.S. § 38-531(6).  Personnel action means:

> (a) Appointment; (b) Promotion; (c) Disciplinary or corrective action; (d) Detail, transfer or reassignment; (e) Suspension, demotion or dismissal; (f) Reinstatement; (g) Restoration; (h) Reemployment; (i) Performance evaluation; (j) Decision concerning pay, benefits or awards; (k) Elimination of the employee's position without a reduction in force by reason of lack of monies or work; or (l) Other significant change in duties or responsibilities that is inconsistent with the employee's salary or grade level.

A.R.S. § 38-531(4).  Drake argues that she was subjected to several adverse employment actions.  *See* Doc. 99 at 13-18.  Many of these actions, however, occurred before Drake filed her complaint with the Arizona Attorney General's Office.[2]  The only actions Drake identifies within the relevant time period are Defendants' alleged failure to address Young's sexual harassment of her.  Doc. 99 at 17-18.  Standing alone, this does not constitute a personnel action within the meaning of A.R.S. § 38-531(4).  But Drake's constructive discharge – if proven – would amount to a dismissal, which qualifies as a personnel action.  A.R.S. § 38-531(4)(e).  A reasonable jury could therefore find that Drake's constructive discharge was reprisal for submitting her complaint to the Arizona Attorney General.

In summary, most of Plaintiffs' disclosures fail to trigger whistleblower protection because they were not written disclosures to a public body.  Drake's complaint to the Attorney General, however, qualifies.  If Drake can show that she was constructively discharged, a reasonable jury could find that she experienced adverse personnel action in reprisal for her disclosure, triggering whistleblower protections.  The Court will grant summary judgment on the whistleblower claims other than Drake's claim based on her Attorney General complaint.

### D.   Constructive Discharge.

Defendants first seek summary judgment on the ground that constructive discharge is not a stand-alone claim and Defendants are entitled to summary judgment on all of

---

[2] The record is unclear as to the precise date of the filing.  Based on the contents of the complaint, Drake appears to have filed it sometime after her schedule was changed on May 22, 2013, but before May 27, 2013.  *See* Doc. 104-6 at 24.

Plaintiffs' other claims.  Docs. 88 at 28; 90 at 31.  As discussed above, the Court has denied Defendants' motions for summary judgment with respect to Plaintiffs' First Amendment retaliation claims stemming from their offensive behavior/harassment complaints filed with the City and Drake's whistleblower claim arising from her complaint to the Attorney General.

Defendants next seek to impose additional barriers to Plaintiffs' constructive discharge claims under Arizona's constructive discharge statute, A.R.S. § 23-1502.  This statute, however, is inapplicable to Plaintiffs' constructive discharge claims based on retaliation for speech protected by the First Amendment, which arise under 42 U.S.C. § 1983, rather than Arizona statutes or common law.  *See* A.R.S. § 23-1502(A) (setting out the requirements for establishing constructive discharge for any action "under the statutes of [Arizona] or under common law").  Because the substantive law governing the two constructive discharge claims differs, they will be considered separately.

## 1. Plaintiffs' First Amendment Retaliation Claims.

To establish constructive discharge in the Ninth Circuit, a plaintiff must demonstrate that "a reasonable person in his position would have felt that he was forced to quit because of intolerable and discriminatory working conditions."  *Huskey v. City of San Jose*, 204 F.3d 893, 900 (9th Cir. 2000) (citation omitted).  An isolated incident is insufficient.  A plaintiff must instead establish aggravating factors, such as a pattern of discriminatory treatment, to support a constructive discharge finding.  *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411 (9th Cir. 1996).  This showing can be based on the "cumulative effect" of defendant's actions.  *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir. 1998).  "Whether working conditions were so intolerable and discriminatory as to justify a reasonable employee's decision to resign is normally a factual question for the jury."  *Schnidrig*, 80 F.3d at 1411(quotation and citation omitted).

Plaintiffs each point to a number of Defendants' actions as creating an intolerable work environment.  Drake points to essentially all of Defendants' actions since April 20, 2013, including her performance evaluations, her schedule change and its effect of

depriving her of training opportunities she had been promised, the change in how she was treated by Defendants on a day-to-day basis, and, most significantly, how Defendants handled her sexual harassment allegations against Young.  Doc. 99 at 20.   Hunter identifies the ballistic vest issue, the assignment to light duty work, the confinement to a conference room where he was allegedly monitored, the change in how he was treated by Defendants on a day-to-day basis, and Defendants' investigation into his use of leave.  Doc. 112 at 19.  Standing alone, none of these actions rise to the level of constructive discharge.  The Court cannot conclude, however, that a reasonable jury would be unable to find constructive discharge when they are considered in the aggregate for each Plaintiff.  *Draper*, 147 F.3d at 1110; *Schnidrig*, 80 F.3d at 1411.  The Court therefore denies Defendants' motions for summary judgment with respect to Plaintiffs' constructive discharge claims based on their First Amendment retaliation claims.

### 2.        Drake's Whistleblower Claim.

A.R.S. § 23-1502 lays out the requirements for constructive discharge based on "any action under the statutes of [Arizona] or under common law." *Id.* § 23-1502(A).  The statute contains two different standards.  First, an employee may always prove constructive discharge with "[e]vidence of outrageous conduct by the employer . . . , including sexual assault, threats of violence directed at the employee, a continuous pattern of discriminatory harassment . . . or other similar kinds of conduct, if the conduct would cause a reasonable employee to feel compelled to resign." *Id.* § 23-1502(A)(2), (F).  Second, an employee may establish constructive discharge with "[e]vidence of objectively difficult or unpleasant working conditions to the extent that a reasonable employee would feel compelled to resign." *Id.* § 23-1502(A)(1).  An employee may invoke this less stringent standard in two circumstances: (1) if the employee provides his employer with fifteen days' notice of his intent to resign to allow the employer the opportunity to address the employee's concerns, or (2) if the employer failed to post a notice in a conspicuous location advising employees of their rights and responsibilities under the constructive discharge statute. *Id.* § 23-1502(A)(1), (E).

It is undisputed that Drake did not provide her employer with advance notice of her intent to resign.  Doc. 89-3 at 44.  Drake therefore cannot invoke the less stringent constructive discharge standard unless Defendants failed to post a notice in a conspicuous location advising employees of their rights and responsibilities under A.R.S. § 23-1502. The parties vigorously dispute whether Defendants posted such a notice.  Defendants submit declarations from several City administrators that the City purchased and prominently displayed posters that complied with the constructive discharge statute. Docs. 89-2 at 4; 89-7 at 3, 7.  The posters were displayed in seven locations, including on the wall outside of the Eloy Police Department's squad room and in City Hall.  Doc. 89-2 at 4.  Drake provides a declaration from Officer Sharonda Dean that she "do[es] not believe the Arizona poster containing the constructive discharge section was posted when [she] looked at the posters just after Hunter left," which was shortly after Drake resigned. Doc. 104-4 at 74.  Given this factual dispute, and the fact that Drake's constructive discharge evidence could be found by a reasonable jury to satisfy the less stringent standard, summary judgment is inappropriate.

**IT IS ORDERED:**

1.     Defendants' motion for summary judgment on claims brought by Plaintiff Kendall Drake (Doc. 88) is **granted in part** and **denied in part** as set forth above.

2.     Defendants' motion for summary judgment on claims brought by Plaintiff Greg Hunter (Doc. 90) is **granted in part** and **denied in part** as set forth above.

3.     Each Plaintiff has a remaining claim for First Amendment retaliation, based on constructive discharge, arising from the filing of their offensive behavior/harassment complaints, and Plaintiff Drake has a remaining whistleblower claim, based on constructive discharge, arising from her Attorney General complaint.

1    4.    The Court will set a final pretrial conference by separate order.

2  Dated this 21st day of October, 2015.

David G. Campbell
United States District Judge